# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| KEVIN MCMAHON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 14 C 973 |
| | ) |
| CAROLYN W. COLVIN, Acting | ) Magistrate Judge Geraldine Soat Brown |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Kevin McMahon seeks review of the Social Security Administration's ("SSA")
decision to deny his application for Disability Insurance Benefits ("DIB") and Supplemental
Security Income ("SSI"). After a hearing, the assigned Administrative Law Judge ("ALJ")
decided that Plaintiff suffers from three severe impairments—personality disorder, right eye
traumatic cataract, and a history of substance addiction—but is not disabled. The ALJ
determined Plaintiff does not have an impairment that meets or is medically equal to a listing
level of disability and he still has the Residual Function Capacity ("RFC") to perform a full
range of work at all exertional levels, albeit with certain non-exertional limitations. On
December 11, 2013, the Appeals Council denied review, rendering the ALJ's decision the final
and reviewable administrative decision of the Acting Commissioner of the SSA
("Commissioner"). 20 C.F.R. § 404.981. This court has jurisdiction pursuant to 42 U.S.C. §
405(g).

In challenging the denial of benefits, Plaintiff argues that the ALJ erred in finding his
cumulative impairments do not meet or equal the severity of one of the impairments listed in 20

CFR Part 404, Subpart P, Appendix 1, which would entitle Plaintiff to a finding of disability. (Plaintiff's Mem. at 5-7.) [Dkt 9.][1] Plaintiff further contends the ALJ erred in determining his RFC by (1) improperly evaluating Plaintiff's credibility; (2) failing to give appropriate weight to the opinions of his treating physicians, including GAF scores they assigned to him; (3) failing to develop the record fully and fairly; and (4) failing to include all of the Plaintiff's relevant limitations in the hypothetical questions posed to the vocational expert. (*Id.* at 7-13.) For the reasons set out below, the Commissioner's motion for summary judgment [dkt 10] is denied, and the case is remanded to the Commissioner for further review consistent with this opinion.

**FACTUAL BACKGROUND**

Plaintiff, born on August 14, 1962,[2] was 37 years old at the alleged onset of his disability. (R. 37.) [Dkt 6.] On January 7, 2010, Plaintiff filed applications for DIB and SSI, alleging that he became disabled on March 31, 2000 due to the vision in his right eye and stress. (R. 156, 160, 177.) The agency denied Plaintiff's applications on May 19, 2010 (R. 87), and again, after reconsideration, on December 6, 2010 (R. 101). Each time, the agency concluded that while Plaintiff's conditions caused "some" restrictions in his ability to function, he retained the ability to perform unskilled work. (R. 91.) Plaintiff then filed a written request for hearing, which was held on September 11, 2012. (R. 35.) The ALJ issued his written decision on October 22, 2012, likewise concluding that, although the medical evidence revealed some functional restrictions,

---

[1]    Plaintiff's memorandum is split into two exhibits at docket entry nine. The court will cite to the memorandum and page number, without specifying which exhibit.

[2]    Plaintiff's Memorandum incorrectly states that Plaintiff testified that he was born on May 11, 1958. (Pl.'s Mem. at 2.) According to the hearing transcript, Plaintiff testified that he was born on "8/14/62," (R. 37), which is the same birth date he listed on his DIB and SSI applications (R. 156).

Plaintiff retained "the residual functional capacity to perform a full range of work at all exertional levels," but with certain nonexertional limitations. (R. 24, 27.)

**Plaintiff's Medical Records**

**A. Vision**

Plaintiff reports that in 1997 he suffered trauma to his right eye resulting in a retinal injury. (R. 21, 250.) He further injured the same eye while he was incarcerated in December 2008, and as of January 22, 2009, his vision was extremely limited. (R. 21, 250, 254-55.) His vision in his left eye was 20/25. (R. 21, 250.) In February 2010, Nora Beltran, M.D., evaluated Plaintiff and concluded that after corrections, his vision in his right eye was limited to counting fingers, although he maintained 20/20 corrected vision in his left eye. (R. 302-03.)

**B. Personality Disorder**

On January 12, 2010, Plaintiff underwent a psychiatric evaluation at the Human Resources Development Institute ("HRDI"). (R. 257-300.) HRDI staff diagnosed Plaintiff as suffering from paranoia, schizoaffective bipolar disorder, and opiate dependence—he was on methadone at the time—and assigned him a GAF score of 30. (R. 262.) "GAF" stands for Global Assessment of Functioning, and a score of between 21 and 30 correlates with "[b]ehavior [that] is considerably influenced by delusions or hallucinations *or* serious impairment in communication or judgment . . . *or* inability to function in almost all areas (*e.g.*, stays in bed all day; no job, home, or friends)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., Text Rev. 2000) (emphasis in original) ("DSM-IV-TR"). The American Psychiatric Association does not include the GAF scale in its new DSM, but the American Psychiatric Association used the scale at the time of Plaintiff's various

evaluations and at the time the ALJ issued his written decision. *See Voigt v. Colvin*, 781 F.3d 871, 874-75 (7th Cir. 2015) (describing history of GAF).

The ALJ's decision states that HRDI staff found Plaintiff could understand cause-and-effect and the impact of his own actions; could make and carry out plans; and that his social behavior was not impaired. (R. 21 (citing Plaintiff's HRDI evaluation).) The ALJ characterization of HRDI's findings is incorrect and appears to stem from a misreading of Plaintiff's medical records. Although HRDI staff indeed checked "Yes" in the boxes associated with Plaintiff's understanding of cause and effect, his ability to make and carry out plans, and his social behavior, the question asked in each section was "are the following abilities impaired?" (R. 270.) In other words, HRDI staff concluded that Plaintiff's ability to perform all of the foregoing functions *was* impaired, not the other way around.

On April 10, 2010, Plaintiff visited the Lake Short Medical Clinic in connection with his claim for disability benefits and underwent a psychiatric examination performed by Ana A. Gil, M.D., a psychiatrist. (R. 309-13.) Dr. Gil noted Plaintiff's history of chronic alcohol dependence and abuse as well as his history of learning disabilities. (R. 312-13.) Plaintiff was not taking any medications at that time. (R. 310.) Dr. Gil concluded that Plaintiff suffered from impairments in his ability to perform calculations, compare and contrast objects, and think concretely, and she determined that Plaintiff's history, symptoms, and signs were indicative of "Borderline Intellectual Functioning." (R. 312.) Dr. Gil did not observe any evidence of psychosis or thought process disorder. (*Id.*) She finally concluded that if Plaintiff were awarded funds, he would not be able to handle them himself. (R. 313.)

On May 12, 2010, a state agency mental health professional performed a "psychiatric review technique" and concluded that Plaintiff's psychological issues did not meet or equal a

listed impairment that would qualify Plaintiff for SSI benefits. (R. 314-330.) The state agency professional further concluded that Plaintiff had a substance addiction, a personality disorder, and a history of learning problems, but could perform simple tasks, follow directions, and leave home alone. (R. 330.)

On January 26, 2011, Plaintiff saw Jessica Weddle, M.D., a psychologist at the Stroger Outpatient Clinic ("Stroger"), in connection with his history of bipolar disorder. (R. 452.) Plaintiff reported to Dr. Weddle that he had problems with frustration and anger tolerance, and was frequently unable to control his emotions. (*Id.*) He also reported problems sleeping and voices in his head, which occasionally commanded him to hurt other people. (*Id.*) Dr. Weddle diagnosed Plaintiff with "unspecified" bipolar disorder and opiate dependence, although she stated that the latter was in full remission. (R. 454.) Dr. Weddle assigned Plaintiff a GAF score of 60, which correlates to "moderate symptoms . . . *or* moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis in original).

Between April 2011 and April 2012, Plaintiff saw Nelda Scott, M.D., another psychiatrist at Stroger. Dr. Scott evaluated Plaintiff on at least six occasions and each time diagnosed Plaintiff as suffering from bipolar or mood disorder and prescribed medication accordingly. (R. 439-77.) Plaintiff again reported hearing voices urging him to harm others, but he denied that he would actually follow through on the commands. (*Id.*) During the one year Dr. Scott treated Plaintiff, she performed a GAF assessment numerous times and assigned a GAF score of 40 every time, except on August 12, 2011, when he received a score or 35. (*Id.*)

**Hearing Testimony**

After the agency twice denied Plaintiff's application for benefits, Plaintiff requested a formal hearing before an ALJ. The hearing occurred on September 11, 2012. (R. 33.) Plaintiff testified and was represented by counsel. (R. 33-76.) The ALJ also heard testimony from Cheryl Hoiseth, a vocational expert ("VE"). (R. 76-81.)

**A. Plaintiff's Testimony**

Plaintiff testified that he is divorced and has three children, who at the time of the hearing were ages 23, 18, and 15. (R. 37-38.) Plaintiff lives in a bedroom of a friend's house, although he does not pay any rent. (R. 38.) He last worked in 2006 and 2007 in the Department of Fleet Management of the Department of Parks and Recreation, where he passed out parts for the mechanics. (R. 38-39.) The job only lasted for six months, however, because Plaintiff was fired because he could not remember the names of some parts. (R. 40, 45.)

He testified that he does not get along with people and frequently gets in fights; he has been incarcerated at least twice. (R. 52, 54.) He testified that he still hears voices in his head urging him to hurt other people and has now lost all sight in his right eye as a result of an injury he suffered when he was last in prison. (R. 59, 61.) Plaintiff occasionally cooks for himself but does not go to the grocery store nor does he do his own laundry. (R. 67.) Plaintiff testified that he likewise has problems taking public transportation since he frequently gets lost, although he did manage to take the train to the hearing. (R. 72.)

**B. Vocational Expert's Testimony**

After Plaintiff's testimony concerning his past work and consulting the Dictionary of Occupational Titles ("DOT"), the ALJ asked the VE to consider an individual who:

is not suited for work requiring fine visual discrimination and [who] lacks depth perception. Additionally, such an individual would be unable to understand, remember and carryout detailed and complex job tasks. He is not suited for work that requires intense focus and concentration for extended periods. He'll only have casual interaction with the general public, and superficial or casual contact with coworkers. He would be expected to be off task about six percent of the time in an eight-hour workday. Would he be able to do the work he did in the past?

(R. 78.) The VE responded that Plaintiff would not be able to perform his past work for the Parks Department. (*Id.*) She opined that Plaintiff could, however, perform the job of a janitor or dining room attendant, and that there were 38,500 such jobs in the national economy. (*Id.*) The VE estimated that an individual would need to maintain concentration 85 percent of the time to perform either job. (R. 79.)

**The ALJ's Findings**

The ALJ concluded that Plaintiff was not under a disability from March 31, 2000 through October 22, 2012, the date of the decision. (R. 27.) The ALJ followed the five-step process set out in Social Security regulations to determine whether the claimant is entitled to benefits. (R. 19-20.) *See* 20 C.F.R. §§ 404.1520, 416.920. The five-step analysis requires the ALJ to examine (1) whether the claimant has engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant is disabled because his severe impairment is at a level listed in 20 C.F.R. § 404.1520(d); (4) if not, whether he can perform his past work given his residual functioning capacity; and (5) if not, whether the claimant cannot perform any other work in the national economy, given his residual functioning capacity, age, education, and work experience. 20 C.F.R. § 404.1520; *see also Cerentano v. UMWA Health & Ret. Funds*, 733 F.3d 976, 980 (7th Cir. 2013).

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 31, 2000, the alleged onset date of his alleged disability. (R. 20.) At step two, he found that Plaintiff had three severe impairments: personality disorder, right eye traumatic cataract, and a history of substance addiction. (*Id.*) The ALJ determined that Plaintiff was not entitled to benefits at step three and proceeded to determine Plaintiff's RFC for his analysis in steps four and five. (R. 22-27.)

The ALJ found that Plaintiff has the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations:

> He is not suited for work requiring fine visual discrimination and he lacks depth perception. He would be unable to understand, remember, and carry out detailed and complex job tasks. He is not suited for work that requires intense focus and concentration for extended periods. He may only have casual interaction with the general public, and have superficial or casual contact with co-workers. He would be expected to be off task 6% of the time in an 8-hour workday.

(R. 24.) The ALJ further found that although Plaintiff is unable to perform any of his past relevant work, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (R. 26.)

**STANDARD OF REVIEW**

The court performs a *de novo* review of the ALJ's legal conclusions, while giving deference to the ALJ's factual determinations. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). In other words, the court "will uphold the Commissioner's decisions so long as the ALJ applied the correct legal standard and substantial evidence supported the decision." *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Jones*, 623 F.3d at 1160 (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). When reviewing for substantial

evidence, the court does not substitute its own judgment for that of the ALJ by re-weighing evidence or making credibility determinations. *Skinner*, 478 F.3d at 841. The court does, however, require that the ALJ adequately explain his decision by building "a 'logical bridge' between the evidence and the conclusions so that [the court] can assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review." *Jones*, 623 F.3d at 1160. "The doctrine of harmless error . . . is applicable to judicial review of administrative decisions." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010).

## DISCUSSION

Plaintiff argues the ALJ erred in finding his cumulative impairments do not meet or equal the severity of one of the impairments referenced in 20 CFR § 404.1520(d), which would entitle Plaintiff to a finding of disability. (Pl.'s Mem. at 5-7.) Plaintiff further contends the ALJ erred in determining his RFC by (1) improperly evaluating Plaintiff's credibility; (2) failing to give appropriate weight to the opinions of his treating physicians, including GAF scores they assigned to him; (3) failing to develop the record fully and fairly; and (4) failing to include all of the Plaintiff's relevant limitations in the hypothetical questions posed to the vocational expert. (*Id.* at 7-13.)

Plaintiff's argument regarding the ALJ's step three determination—that Plaintiff's impairments do not meet a listing that would entitle him to an automatic finding of disability—is quite limited. Although Plaintiff quotes 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.04 from the SSA's relevant mental health regulations and summarily states that he "meets the listing" (Pl.'s Mem. at 6), he fails to explain why he meets the listing or why the ALJ's analysis was incorrect. The regulation requires "marked" restrictions or repeated episodes of extended

decompensation, which the examiners did not find. Plaintiff has provided the court no basis to question the ALJ's step three analysis.

Plaintiff also challenges the ALJ's RFC determination on several grounds, two of which are dispositive here: the ALJ's failure to explain adequately why he found portions of Plaintiff's testimony not credible, and the ALJ's failure to accord proper weight to the medical evidence from Plaintiff's treating physicians, including those physicians' reliance on GAF scores. The court addresses each argument below.

Plaintiff first contends that the ALJ did not adequately explain why he found Plaintiff's testimony concerning his symptoms not credible to the extent the testimony was inconsistent with the ALJ's own RFC assessment. (Pl. Mem. at 5.) An ALJ's credibility assessment is "entitled to special deference because the ALJ is in a better position than the reviewing court to observe a witness . . . but they are not immune from review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 354 (7th Cir. 2005). A district court may "overturn a credibility determination only if it is patently wrong," *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008), or if the ALJ fails to "justif[y] her conclusions with reasons that are supported by the record," *Richards v. Astrue*, 370 Fed. App'x 727, 731 (7th Cir. 2010). To build the required logical bridge for a credibility determination, the ALJ must consider not only the objective medical evidence, but also the claimant's daily activity; the duration, frequency, and intensity of pain; any precipitating and aggravating factors; the dosage, effectiveness, and side effects of medication; and functional restrictions, among other factors. *See* S.S.R. 96–7p, 1996 WL 374186, at *3; *Villano*, 556 F.3d at 562–63 (demanding an analysis of the factors listed in S.S.R. 96–7p as part of building a logical bridge for credibility determinations). In particular, "[u]nder Social Security Ruling 96–7p, an ALJ's evaluation of a[n] applicant's credibility must be specific enough to make clear to

[the court] how much weight the ALJ gave to the applicant's testimony and the reasons for that decision." *Hill v. Astrue*, 295 Fed. App'x 77, 81 (7th Cir. 2008).

Plaintiff argues the ALJ's analysis of his credibility constituted merely the "opaque boilerplate" often rejected by the Seventh Circuit, and thus must be rejected here as well. *See, e.g.*, *Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012). The ALJ's opinion states:

> After careful consideration of the evidence, I find that the claimant's medical determinable impairments could reasonably be expected to cause the alleged symptoms; however the claimant's statements concerning the intensity, persistence and limiting effects of these are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(R. at 25.) In fact, the ALJ's language closely mirrors the "piece of opaque boilerplate" the Seventh Circuit criticized in *Bjornson*.[3] Such language is harmless if it is followed by an explanation for rejecting the claimant's testimony. *Schomas v. Colvin*, 732 F.3d 702, 708 (7th Cir. 2013). But that is not the case here. The ALJ's credibility analysis apparently begins and ends with the boilerplate and is therefore inadequate under Seventh Circuit precedent.

The government also points to the following passage later in the ALJ's decision as evidence of a more nuanced credibility analysis:

> With respect to his personality disorder and substance addiction disorder, the record also documents that the claimant is limited by these mental impairments. He denied current alcohol or recent drug use, but toxicology testing in 2010 showed that he was still using opiates and cocaine on occasion, even while he was on methadone. In 2011, he told his psychiatrist that he occasionally used cocaine;

---

[3] The boilerplate language was:

> After careful consideration of the evidence, the undersigned [administrative law judge] finds that the claimant's medically determinable impairments would reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

*Bjornson*, 671 F.3d at 644.

but at the most recent exam, in April 2012, he indicated that he had not used drugs in quite some time. He still used alcohol, drinking a few beers per week.

(R. at 25.) The problem with the government's attempt to salvage the ALJ's credibility assessment is that Plaintiff's statements concerning his drug addiction are not inherently inconsistent. He denied "current" drug use at the time of the hearing in September 2012; it is not clear why the ALJ would believe Plaintiff's toxicology tests in 2010 undermine that assertion. Similarly, the fact that Plaintiff admitted to his psychiatrist in 2011 that he occasionally used cocaine does not undermine his April 2012 statement stating that he had not used drugs "in quite some time." (R. at 25.) The court cannot tell whether the ALJ found Plaintiff's statements concerning his relatively light alcohol use—a few beers per week—to be contradictory to his statements concerning his drug use. At any rate, such a contradiction is far too flimsy to serve as the basis for discrediting substantially all of Plaintiff's testimony concerning his impairments.

The court is faced with two alternative interpretations of the ALJ's credibility analysis: the analysis was either confined to the opaque boilerplate, as appears to be the case, or it was based on Plaintiff's past statements to care providers regarding his drug use—statements the court does not find inherently contradictory to his current testimony and which, in any case, do not provide a sufficient explanation for the court to review why the ALJ found Plaintiff's hearing testimony about his psychological impairments not credible. *Kastner v. Astrue*, 697 F.3d 642, 648 (7th Cir. 2012) ("We have repeatedly held that an ALJ must provide a logical bridge between the evidence in the record and her conclusion.") Under these circumstances, the court cannot affirm the ALJ's credibility analysis because it is inadequate under established Seventh Circuit standards.

Plaintiff's argument concerning the ALJ's failure to accord proper weight to the medical evidence from Plaintiff's treating physicians also has merit, particularly with regard to the ALJ's

treatment of Plaintiff's GAF scores. The ALJ accorded "great weight" to the opinions of the state agency mental health consultants because the "credible evidence in the record that was before them supports their opinions." (R. 25.) The ALJ's complete discussion of their "opinions" is as follows:

> The state agency mental health professional at the initial level found that the claimant had no impairment that met or equaled a listed impairment. He retained the ability to perform a range of work at the unskilled level (Exhibits 5F, 6F). The state agency mental health professional at the reconsideration level affirmed that opinion (Exhibit 9F).

(R. 21.)

In contrast, the ALJ provided summaries of the records from Plaintiff's treating physicians, but said there was "no opinion from a treating source." (R. 21-22, 25.) The ALJ apparently chose to disregard most of the evidence from Plaintiff's treating physicians and to focus on the GAF scores. The ALJ did not consider Plaintiff's history of GAF scores indicating serious mental illness because, he said, GAF scores incorporate issues outside of mental impairment, such as family, housing, and occupational concerns, which the ALJ stated were not pertinent to the disability determination. (*See* R. 25.) This was an error. Aside from ignoring the general rule that an ALJ must accord controlling weight to the opinion of a claimant's treating physician if it is supported by medically acceptable evidence, *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010), the ALJ's wholesale rejection of GAF scores does not comport with Seventh Circuit precedent. The Seventh Circuit has considered GAF scores as part of the process of assessing an individual's RFC because it was one of the primary tools used by mental health professionals (although that is no longer the case). *See, e.g.*, *Voigt*, 781 F.3d at 874.

The Commissioner responds, correctly, that the Seventh Circuit has held that an ALJ is not required to determine the extent of a claimant's disability based entirely on his GAF score. (Def.'s Resp. at 10 [dkt 11] (citing *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).) But the

Seventh Circuit's decision in *Denton* does not mean that an ALJ may completely ignore GAF scores, nor can an ALJ discard the opinions of a claimant's treating physicians because they included GAF scores. *See Cleary v. Astrue*, 2013 WL 4476418 at *13 (N.D. Ill. Aug. 19, 2013) (holding that an "ALJ's failure to consider, analyze, or even mention [a claimant's] GAF scores gives us no confidence that he appropriately considered the medical findings and opinions"). On remand, the Commissioner should consider all of the evidence essential to creating a complete picture of Plaintiff's mental health, including the low GAF scores routinely assigned by his treating physicians. *See id.*

Another problem with the ALJ's opinion is his conclusion that Plaintiff would be off-task 6% of the time. (R. 24.) The ALJ gives no citation in the record to support that conclusion, which seems untethered to anything in the record. The state agency consultant opined in 2010 that Plaintiff has "moderate" (more than "mild") limitations in the area of "maintaining concentration, persistence, or pace." (R. 324.) How does that translate to off-task 6% of the time? The ALJ does not explain. That conclusion is potentially dispositive because the VE testified that there would be no jobs available if Plaintiff is not able to concentrate 85% of the time. (R. 79.)

The ALJ's RFC determination may change upon review of Plaintiff's testimony and his complete medical records, and the hypotheticals posed to the vocational expert may need to be revised if the ALJ's RFC determination does indeed change. The court therefore expresses no opinion on the merits of Plaintiff's remaining arguments or on the ultimate question of whether Plaintiff is disabled and entitled to benefits.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment [9] is granted, and the Commissioner's summary judgment motion [10] is denied. The case is remanded to the Commissioner pursuant to 42 U.S. C. § 405(g) for further proceedings consistent with this opinion. Judgment is entered in favor of the Plaintiff and against the Commissioner.

ENTER:

_____
GERALDINE SOAT BROWN
United States Magistrate Judge

Date: September 11, 2015